### THE THORNLEY.

(District Court, E. D. New York. July 16, 1900.)

MARITIME LIEN—DAMAGES FOR BREACH OF CHARTER—ESTOPPEL BY SETTLEMENT.

While a steamship was under a time charter to the libelant, she became stranded, and received injuries which subsequently made it necessary for her to be docked for repairs, after which libelant resumed his use of her under the charter. In the next settlement he claimed and was allowed a deduction for the time lost in making the repairs. He made subsequent payments from time to time under the charter, and on its termination made a final settlement with the owners, no claim for further damages having been made on account of the injury. *Held*, that he was estopped by such settlements from subsequently asserting a lien upon the vessel for such further damages after her sale to a bona fide purchaser with no notice of libelant's claim.

In Admiralty. Suit in rem to recover damages for breach of charter.

Wheeler & Cortis, for libelant.

Convers & Kirlin, for claimant.

THOMAS, District Judge. The steamship Thornley, under a time charter to the libelant, during a voyage from Philadelphia to Tampico, stranded at Elbow Reef, on the coast of Florida. A part of the cargo was jettisoned, whereby she was floated, and taken to Key West,

where a diver examined her bottom, and reported absence of serious injury, but a thorough examination of her bottom was impracticable before she went on dry dock. A consular survey was had at the same port, and a certificate of seaworthiness was given. Accordingly the vessel, with her cargo, went to Tampico, where the discharge of the cargo was finished on or about the 29th day of December. The charterer, having no return cargo, paid the port charges, and ordered the vessel to Baltimore, to take on another cargo for Tampico. During the voyage to Baltimore the vessel met with heavy weather off Cape Hatteras, and during and after such storm she leaked in one of her tanks. Upon her arrival at Baltimore on January 13th, the vessel was placed on dry dock, and her bottom was found to have been indented and injured at Elbow Reef, and proper repair was made. The charterer, on February 25th, resumed his use of the vessel, and continued her employment until May 12th, when he delivered her to the owners, and the charter party was ended by mutual consent. In the latter part of May the vessel was sold to the claimants, who purchased in good faith, and without knowledge of the libelant's present claim. This action in rem was begun on the 7th day of December following, and is based upon the claim that when the vessel left Tampico she was not in fact seaworthy to carry a return cargo, provided the charterer then had one,—as he had not,—and that by the terms of the charter party the charter hire ceased, the vessel was at the expense of the owners until her restoration to a suitable carrying condition, and that he should recover back the sum of $2,680.59, the hire paid for the ship from 29th December, the date of her discharge at Tampico, until January 13th, when she arrived at Baltimore; also $341.25, the value of the coal consumed on the return voyage; also $11.99, the port charges at Tampico. Further facts remain to be stated. The charterer paid no charter hire for the time the vessel was under repair at Baltimore, but after she came from the dry dock a settlement for loss of time growing out of the stranding was had, and the following receipt shows the understanding and claims of the parties relative thereto:

18 Broadway, New York, Feb. 28th, '99.

W. D. Munson, Esq., to Bennett, Walsh & Co., Dr.

To Hire of S. S. Thornley, as per Charter Party, from Jan. 6th, 1899, to Feb. 6th, 1899.

| | |
|---|---|
| Second half of month at 8/1 p. g. (2847)—£1,138.16.0 per calendar month, £569.8.0 at $4.85 | $2,761 59 |
| Feb. 6 to Mar. 6, first half, £569.8.0 at $4.85 | 2,761 59 |
| Feb. 6 to Mar. 6, second half, £569.8.0 at $4.85 | 2,761 59 |
| | $8,284 77 |

Less.

| | | |
|---|---|---|
| Time lost from Jan. 13, 10 a. m., Feb. 6, 10 a. m., 24 days, 31 dy. mo., 8/1 per mo., £881.12.0 at $4.85 | $4,275 76 | |
| Time lost from Feb. 6, 10 a. m., to Feb. 25, 10 a. m., 19 dys., 28 dy. mo., £772.14.11 at $4.85 | 3,747 82 | |
| Com. 2½% | 6 53 | |
| | | 8,030 11 |
| | | $ 254 66 |

Received payment,                                    Bennett, Walsh & Co.

Moreover, from March 6th to May 13th semimonthly settlements for charter hire were had, and on the latter date a final settlement occurred, pursuant to which the libelant paid the sum of $1,082.10, which, together with a certain allowance for coal on hand, made up the hire then apparently due. At none of these settlements, and at no time previous to a demand made subsequent to the sale of the vessel, was any claim suggested for the alleged loss of time now the subject of controversy. With these facts in mind, it becomes necessary to inquire, what knowledge, during all this time, the charterer had respecting the condition of the vessel after the stranding. From Key West, under the date of December 4th, the master of the vessel telegraphed the charterer: "Arrived here this morning. Jettisoned five hundred tons of coal. Will probably sail Monday after settling salvage claim. Diver examining bottom. Anticipate no danger." Previous to the arrival of the vessel at Baltimore, the charterer received no further report concerning the vessel, and had no futher knowledge of her condition previous to her leaving Tampico, although he had an agent at Tampico. There is no contention that the charterer did not know the vessel was put on dry dock and repaired on account of injuries received from the stranding, if such was the case. While the evidence does not show that the vessel was disabled from carrying a cargo from Tampico, yet, if that be assumed, it is quite certain that the libelant has no lien enforceable against the ship after the sale. On February 28th he settled his claim for loss of time. He repeatedly failed to present any claim thereafter by paying charter hire, and surrendered the ship finally, making deductions claimed by him, and ignoring the claim now presented, of which in fact he had full knowledge. The settlement of February 28th was a specific settlement of claims for loss of time arising from injury from stranding, and the subsequent settlements and payments were confirmatory, and the final settlement evinces the ultimate understanding of the parties upon the severance of their relations. The valuable presentation by the libelant's proctors of the authorities, illustrating that laches may not arise necessarily from lapse of time or sale of the ship to a bona fide purchaser, fail to meet the real reason for estopping the libelant's enforcement of his present action. Such estoppel does not spring from the brief time that intervened between the opportunity to present the claim and its actual presentation and attempted enforcement, nor from the mere fact of a sale to a bona fide holder, but from the settlement of the claims arising out of the charter party. By reason of such settlement the owner of the vessel was justified in believing that there was no further claim against her, and that he might sell the vessel free from liens; and the purchaser, who may be presumed to have made inquiry of the owner, could be assured, upon the basis of the libelant's own conduct, that all matters relating to the charter party had been arranged. In view of such adjustments it is considered that the libelant cannot, with good conscience, ask that the ship shall respond for the claim here involved, whatever may be the legal right of the libelant to reopen the accountings concluded with the former owner. It follows that the libel should be dismissed, with costs.